UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v.    )<br>)<br>ANDRE ECHEVARRIA,    )<br>)<br>Defendant.    ) | No.  1:20-CR-10136-8 |

**SENTENCING MEMORANDUM OF THE UNITED STATES**

The United States submits this sentencing memorandum to assist the Court in imposing a fair, reasonable, and sufficient sentence in the case against Andre Echevarria.  Echevarria faces sentencing following his guilty plea to Count One of the Indictment charging him with conspiracy to distribute and possess with intent to distribute cocaine, in violation of 21 U.S.C. § 846.  For the reasons set forth herein and those to be advanced at the sentencing hearing, the government respectfully requests that the Court sentence Echevarria to ***41 months imprisonment to be followed by three years of supervised release***.[1]  Such a sentence is warranted given the nature and circumstances of the offense, the history and characteristics of the defendant, and the purposes underlying sentencing set forth in 18 U.S.C. § 3553(a).

I. **The Nature and Circumstances of the Offense Support the Government's Proposed Sentence[2] as well as the Government's Estimated Drug Weight Calculation**

During the course of a twenty-month investigation headed by the Drug Enforcement Administration ("DEA"), the Boston Police Department ("BPD"), and other state and local

---

[1] The defendant pleaded guilty pursuant to a plea agreement under Fed. R. Crim. P. 11(c)(1)(C). Under the provisions of that agreement, the defendant likewise has agreed to a sentence of 41 months imprisonment to be followed by 36 months' supervised release.

[2] The United States relies upon the offense conduct set forth in the Presentence Report (PSR), including paragraphs 7 through 32.

agencies, law enforcement identified Echevarria as a drug distributor who purchased wholesale quantities of cocaine from up-the-chain drug suppliers Winston McGhee and Derek Hart, who were part of a large-scale DTO operating within the Boston area during the period of June 2019 through June 2020.  Specifically, law enforcement intercepted Echevarria communicating with McGhee and Hart over several target telephones.  On those calls, Echevarria and the call participant (either McGhee or Hart) – using brief, guarded, and coded language (including terms like "fizz," "sev," "sissy," "undone," "Doob," "four way," "joints," "cooked") – negotiated drug deals which law enforcement, at times, corroborated via surveillance.  Those intercepted deals occurred in October 2019 and April 2020.  Generally, investigators estimated that Echevarria negotiated a sale of seven grams of cocaine from Hart in October 2019, a purchase from McGhee of 125 grams and 62 grams on April 4, 2020, a subsequent negotiation on April 7, 2020 for 62 grams of cocaine (after the prior 62-gram batch proved to be bad), and another deal (for an unknown drug quantity) from Hart in April 2020, resulting in an estimated drug weight falling between 200 and 300 grams of cocaine.

      The intercepted calls between Echevarria and McGhee and Hart – while not numerous – are telling.  At a minimum, they make clear that Echevarria dealt in crack and powder, that he sought to learn how to best convert powder into crack, and that the individuals with whom he consulted, dealt, and had easy access to (at least telephonically) were two of the highest-level drug suppliers within the DTO.  Indeed, during a series of intercepted calls on April 7, 2020, McGhee took time not only to try and help Echevarria convert previously purchased powder into crack, but he also offered to "g[e]t you right situated, I'mma make sure you straight" when it became clear that Echevarria's cooking conversion efforts were failing, resulting in an overall bad drug batch.  *See* PSR ¶ 28.

Specifically, on April 7, 2020, Echevarria called McGhee to complain about the quality of drugs that he had previously purchased from McGhee days earlier over intercepted calls (which surveillance corroborated after seeing McGhee meet with an individual in a blue Nissan Rogue, subsequently confirmed to be Echevarria, in the same manner coordinated over the calls). *See* PSR ¶¶ 17-22. During that prior deal (on April 4, 2020) and based on intercepted calls, law enforcement determined that Echevarria had purchased 125 grams of cocaine and 62 grams of cocaine from McGhee. *Id*.

At the time of his quality-complaint on April 7, 2020, Echevarria had been attempting to cook, or convert, the previously purchased 62 grams of cocaine powder into crack, but the drugs were not cooking properly. *Id.* ¶24. McGhee proceeded to explain in detail how Echevarria should cook the drugs to convert them to crack. *Id.* ¶25-28. Ultimately, when McGhee's attempted cooking lesson failed and Echevarria had unsuccessfully attempted to convert at least some of the 62 grams of cocaine into crack, Echevarria requested a new batch of 62 grams of cocaine from McGhee so that he could start anew in his cooking efforts. *Id.* ¶ 31. Echevarria also offered to give to McGhee the remnants of the prior 62 grams that he had previously attempted to cook. *Id.*

It is unclear how much of that initial "bad batch" of cocaine was returned to McGhee or in what form (i.e., powder versus base) given that, during their calls, Echevarria had made clear that he would apply McGhee's cooking tactics to the remaining 30 grams of cocaine he had left ("I'mma try that with the 30 I got left, with the 30 I got left done"). Further, during a subsequent call that occurred before Echevarria finalized a new 62-gram cocaine deal with McGhee, Echevarria informed McGhee that he had previously met with Hart that day (which toll records between Echevarria and Hart's phones for that day corroborated). *See* PSR ¶ 30. Based on

Echevarria and Hart's known drug-trafficking relationship, as well as Echevarria's previously intercepted statement to McGhee earlier that day that he had been "waiting on something right now," law enforcement suspected that Echevarria and Hart had met to do a drug deal. Thus, when investigators intercepted Echevarria telling McGhee that he had "63 . . . all in one block still," to which McGhee responded that he was "grabbing [a Doobie] right now," it was not clear to them how much of McGhee's original 62 grams of cocaine Echevarria ultimately was returning to McGhee or in what form. What was clear, however, was that Echevarria – after purchasing a bad batch of 62 grams of cocaine from McGhee – extensively consulted McGhee to learn how to salvage his cooking-conversion efforts with the initial bad batch before ultimately requesting a new 62-gram batch of cocaine from McGhee, which McGhee agreed to provide to him. *Id.* ¶ 31.

For these reasons, adding up the various drug deals negotiated via intercepted calls between Echevarria and Hart in October 2019 (seven grams) and Echevarria and McGhee in April 2020 (125 grams, 62 grams, and 62 grams) – and acknowledging the suspected but unknown drug-weight deal with Hart in April 2020 – the government estimates the defendant's drug weight falls between 200 and 300 grams of cocaine. *See generally United States v. Nelson-Rodriguez*, 319 F.3d 12, 56 (1st Cir. 2003) ("Under the sentencing guidelines, . . . the sentencing court should base the defendant's drug-quantity finding on the negotiated amount of drugs"); *United States v. Sepulveda*, 15 F.3d 1161, 1197 (1st Cir. 1993) (noting that drug weight in a conspiracy is calculated based off of drug amounts, actual or negotiated, or personally handled or anticipated to be handled, that were reasonably foreseeable to a defendant and committed in furtherance of the conspiracy); *United States v. Jennings*, 12 F.3d 836, 838-39 (8th Cir. 1994)

(no plain error where court estimated drug weight from both a "bad batch" and a replacement batch of drugs when computing defendant's sentence).

After intercepting various calls between Echevarria and two of the DTO's main wholesale drug suppliers, law enforcement subsequently executed a search warrant at Echevarria's identified residence and recovered a Smith & Wesson cloth gun bag, a Smith & Wesson magazine, and four rounds of CBC auto .380 ammunition. At the time of his arrest, law enforcement also searched a vehicle confirmed to belong to Echevarria and in which he previously had been driving and recovered a Smith & Wesson .380 caliber pistol with an obliterated serial number, and a magazine with six rounds of CBS auto .380 ammunition.

Echevarria's calls and corresponding surveillance made clear that he was a drug trafficker who dealt with high-level suppliers. His personal areas - including residence and car (Echevarria commonly rented and changed cars during the investigation) – also showed that Echevarria sought to protect himself through violent means, namely, a firearm. Indeed, the ammunition found in Echevarria's residence (21 Weston Avenue) matched the ammunition and caliber of the firearm found in his vehicle at the time of his arrest.

The evidence reflects the serious nature of the offense to which Echevarria has pleaded guilty – drug conspiracy. *See United States v. Clifford*, 2021 WL 217600, at *7 (D. Me. Jan. 21, 2021) ("[I]t does not follow [that] the crime of possession of large quantities of cocaine for distribution is not harmful to the public."); *see also United States v. Cortes-Caban*, 691 F.3d 1, 44-45 (1st Cir. 2012) (J. Torruella, dissenting) (observing that object and intent of Controlled Substances Act was to control drug abuse and drug trafficking). It also further reinforces the interconnected nature of guns and drugs in the drug dealing world. *See United States v. Arnott*, 758 F.3d 40, 45 (1st Cir. 2014) ([T]he connection between drugs and violence is, of course,

legendary."); *United States v. Gilliard*, 847 F.2d 21, 25 (1st Cir. 1988) (firearms are "tools of the [drug] trade"); *United States v. Hinds*, 856 F.2d 438, 443 (1st Cir. 1988) (noting "[w]e have only to read the daily newspapers or watch the news on television to recognize that narcotic dealing and guns go hand in hand"); *see also United States v. Randle*, 815 F.2d 505, 508 (8th Cir. 1987) ("Firearms are frequently possessed by narcotics dealers to protect themselves and their drugs.").

II. **History and Characteristics of the Defendant**

The defendant's criminal history is highly troubling. He is estimated to be a Criminal History Category VI based on his prior convictions. *See* PSR ¶ 48-61. The defendant is now in his early forties. His criminal history dates from when he was ten years old (an arrest) and reflects a number of serious offenses ranging from possessing with intent to distribute drugs (Class B, Class D), carrying a firearm without a license (multiple convictions), possession of firearm without FID card, possessing a firearm without a license, armed robbery, forgery, furnishing a false name, and assault and battery (among other offenses). Echevarria's record also includes numerous violations of probation, revocations of probation, and notes a number of serious disciplinary infractions, including fighting and possessing a weapon, *see* PSR ¶ 61. Most notably, the defendant committed the underlying offense of drug conspiracy (which included possessing a dangerous weapon) **while on probation for a 2014 state firearm conviction**. As noted, the defendant has multiple prior firearm convictions on his record.

The defendant's record is troubling because it shows that the defendant, as he has aged, has not removed himself from criminal behavior or conduct. Stated differently, this case highlights a disturbing reality – despite now being in his forties and having served sentences for firearm and drug-related convictions – the defendant has remained utterly undeterred in participating in criminal conduct. His continued criminal conduct – and the consistency of its

nature (guns and drugs) – also shows no respect for the law.  That Echevarria was engaging in drug trafficking and firearm possession **while on probation for a firearm conviction** only further highlights this prior point.

Further, Echevarria's family history and upbringing does not reflect a number of the struggles or absence of support systems that the Court more often encounters with defendants with such a serious criminal record.  The PSR indicates that while Echevarria's childhood had ups and downs and financial struggles, he was "raised by both parents," "had good relationships with his family members," and suffered no abuse. PSR ¶ 78.  While he has experimented with drugs (marijuana and cocaine) in the past, he does not seem to have struggled from any drug or alcohol addictions.  *Id.* ¶¶ 93-96.  The defendant had two children when he was still very young (apparently a minor himself at the time his first son was born).  One currently is incarcerated at Souza Baranowski on a five-year assault sentence.  While having two children when very young undoubtedly presented challenges and possibly hardships for Echevarria, Echevarria also indicated that he has had a supportive relationship with the mother of his children that, while now over, ended on good terms.  *Id.* ¶ 83.  And Echevarria makes clear in his sentencing memorandum that he continues to be in a supportive relationship, *see* Dkt. No. 682 at 5, and that he has stable, productive employment, *id.*; *see also* Dkt. No. 682-1.  The question thus remains as to why Echevarria has continued down a criminal path.  One of the government's primary interests is ensuring protection of the public.  Echevarria's history and the conduct in this case raises concerns about the danger he presents – not only to members of the public, but to himself – if he does not turn his life around.

**III.    The Need for a Sentence to Afford Adequate Deterrence, Promote Respect for the Law, and Protect the Public Further Supports the Government's Proposed Sentence**

The various factors under 18 U.S.C. § 3553(a) further support the government's sentencing recommendation of 41 months imprisonment and 36 months of supervised release. Prior arrests, convictions, violations and revocations of probation, employment, and family presence and support, have not been enough to deter Echevarria from engaging in criminal activity. The need to promote respect for the law and protect the public demands a meaningful sentence. The government's recommended sentence of 41 months is fair. It constitutes a below Guidelines sentence (according to the government's calculation) or, alternatively, a low-end Guidelines sentence (according to the defense and probation's calculation) while acknowledging the seriousness of the defendant's conduct, the scope of his role in the overall charged offense, and the nature of his criminal history. Accordingly, the government believes that a sentence of 41 months' imprisonment is a fair and reasonable recommendation.

Lastly, to further ensure the public's protection, to give this Court a greater ability to respond to potential future misconduct by the defendant, and to give the defendant appropriate structure when reintegrating into society, the government requests that along with a meaningful period of incarceration, the Court impose a three-year term of supervised release. A period of three years' supervised release will both protect the public and comply with the other sentencing goals articulated under 18 U.S.C. § 3553(a).

## Conclusion

For the reasons above and those to be advanced at the sentencing hearing, the government respectfully requests a sentence of ***41 months imprisonment to be followed by three years of supervised release***.

                                                  Respectfully submitted,

                                                  JOSHUA S. LEVY
                                                First Assistant United States Attorney

                                                By:    */s/ Kaitlin R. O'Donnell*
                                                                 Kaitlin R. O'Donnell
                                                                 Timothy E. Moran
Date:  May 27, 2022                               Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

*/s/ Kaitlin R. O'Donnell*
Kaitlin R. O'Donnell
Assistant U.S. Attorney

Date: May 27, 2022